COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Petty and Decker
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.       Record No. 1515-14-1              JUDGE WILLIAM G. PETTY
                                          JANUARY 9, 2015

JERMAINE DURELL SPENCE


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
William R. O'Brien, Judge

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on briefs), for appellant.

Suzanne Moushegian, Deputy Public Defender (Office of the Public
Defender, on brief), for appellee.


This is a pre-trial appeal by the Commonwealth pursuant to Code § 19.2-398.  Jermaine

Durell Spence was indicted on April 21, 2014 for possession of a controlled substance with intent to

distribute, in violation of Code § 18.2-248.  Spence made a motion to suppress the introduction of

evidence that was discovered when he was detained by the police.  The trial court issued a written

opinion granting the motion to suppress.  On appeal, the Commonwealth argues that the trial court

erred in ruling that the Commonwealth's evidence should be suppressed.  For the reasons stated

below, we agree and reverse the ruling of the trial court.

I.  BACKGROUND

On February 9, 2014, Officer Michelle Schwegler responded to a reported burglary in

progress at the Magnuson Hotel in the City of Virginia Beach.  The dispatcher indicated that the

hotel's front desk clerk had called and relayed information provided by hotel guests.  The front

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

desk clerk gave the dispatcher her name and contact phone number, both of which were provided to Officer Schweiler. According to the guests, two people were banging on the door of room 175 and it appeared that they were trying to break into the room. The suspects were described as a black male wearing a navy blue hoodie and jeans and a white female wearing a gray sweat suit and driving a dark SUV. The male suspect came to the front desk and asked the clerk for keys to the room. The front desk clerk described the male as "very intoxicated and high."

Officer Schwegler arrived at room 175 within minutes of receiving the call from dispatch. A black SUV was parked in front of the room. A white female wearing a gray sweatshirt, matching the description given by the dispatcher, was sitting in the SUV's driver seat. When Schwegler asked the female about the male she was with, the female pointed to the open door of the room.

Officer Schwegler approached the room and saw no signs of forced entry. She stepped into the open doorway and saw Spence wearing a dark sweatshirt and jeans, matching the description of the male suspect. Spence's eyes were "going everywhere," he appeared incoherent, he was mumbling, and he had white powder in the corner of his mouth. Schwegler looked past Spence, into the room, and saw a black female and a white female. The white female was on her knees with her hands on the desk. She looked very sick, she had a sunken face, and her mouth was hanging open. Schwegler asked what was going on, but the white female was unable to respond. Spence and the black female responded that everything was fine.

While Officer Schwegler radioed for medical assistance for the white female, Spence tried to push past Schwegler through the doorway. The officer put her hand up and told Spence he needed to wait a second while she figured out what was going on. Spence again tried to push past her, and a struggle ensued. Schwegler grabbed Spence's arms and attempted to place him in handcuffs. As she secured Spence's right hand with the handcuff, Spence pulled his left hand

out of her grasp and placed it into the left pocket of his sweatshirt. Schwegler grabbed Spence's wrist and pulled it out of his pocket because she was worried about what he was trying to get from his pocket. Spence took a clear plastic bag containing purple and green squares out of his pocket, tossed the bag on the floor, and said, "that's on the floor. That can't be mine." It was later verified that the bag contained heroin. The officer then successfully handcuffed Spence.

Spence filed a motion to suppress the evidence resulting from the seizure. At the suppression hearing, Officer Schwegler testified that, when she attempted to prevent Spence from leaving, she suspected him of breaking into the hotel room, committing burglary, and committing trespass. The officer admitted that she did not know who had rented the room. The trial court issued a memorandum opinion granting the motion to suppress. The trial court found that the seizure was not a justifiable Terry stop because the officer saw no signs of a burglary at the scene and the sick female was not unconscious or wounded. The trial court stated that "although the scene in the room seemed strange, it seemed strange in a way that was not related to a burglary." The court found that the only facts giving rise to a suspicion of criminal activity were the hotel guests' reports of an attempted break-in and the matching description of the suspects. However, the court concluded that the front desk clerk was relaying information from guests and did not have first-hand knowledge of the alleged break-in. Therefore, the court found that the tip was not reliable enough to justify a Terry stop. The Commonwealth appealed.

## II. ANALYSIS

"On appeal of a ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, here [Spence], granting to the evidence all reasonable inferences deducible therefrom." Cherry v. Commonwealth, 44 Va. App. 347, 356, 605 S.E.2d 297, 301 (2004). "'We are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them.'" Id. (quoting McGee v. Commonwealth, 25

Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*)). But, "we review *de novo* the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case." Id.

The Commonwealth argues that the totality of the circumstances, including the tips of criminal activity and the officer's observations at the scene, provided reasonable, articulable suspicion to justify stopping Spence. The dispatch information bore adequate indicia of reliability, and an officer need not observe explicitly criminal behavior or suspect a particular crime to justify the stop. Spence responds that the dispatch information was no more than an anonymous tip that was not reliable enough to justify the investigatory stop. Further, he argues, the scene did not show any signs of burglary or other criminal conduct.

"Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, a police officer 'may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'"[1] Beasley v. Commonwealth, 60 Va. App. 381, 395,

---

[1] In evaluating whether information known to a police officer rises to the level of reasonable suspicion, it is informative to consider the conduct involved in the original Terry stop. In that opinion, the Court described the following conduct by John Terry and his partner in crime Richard Chilton and concluded that it was sufficiently suspicious to warrant Officer McFadden to conduct a "stop and frisk."

> His interest aroused, Officer McFadden took up a post of observation in the entrance to a store 300 to 400 feet away from the two men. "I get more purpose to watch them when I seen their movements," he testified. He saw one of the men leave the other one and walk southwest on Huron Road, past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down Huron Road, looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual alternately between five and six times apiece — in all, roughly a dozen trips. At one point,

728 S.E.2d 499, 505 (2012) (quoting Bass v. Commonwealth, 259 Va. 470, 474-75, 525 S.E.2d 921, 923 (2000)).  "Although a mere 'hunch' does not create reasonable suspicion, Terry, 392 U.S. at 27, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause, United States v. Sokolow, 490 U.S. 1, 7 (1989)."  Navarette v. California, 134 S. Ct. 1683, 1687 (2014).  In other words, "[a] 'reasonable suspicion' requires only 'some *minimal* level of objective justification' for making such a stop."  Beasley, 60 Va. App. at 395, 728 S.E.2d at 505 (emphasis added) (quoting I.N.S. v. Delgado, 466 U.S. 210, 217 (1984)).

For a seizure to be reasonable, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," justify the investigatory stop.  Terry, 392 U.S. at 21.  However, in reviewing the reasonableness of an investigatory stop, "'we are not limited to what the stopping officer says or to evidence of his subjective rationale, rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.'"  Raab v. Commonwealth, 50 Va. App. 577, 589 n.2, 652 S.E.2d 144, 148 n.2 (2007) (*en banc*) (quoting United States v. Brown, 232 F. 3d 589 (7th Cir. 2000)).  An action can be reasonable "'under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action.'"  Id. (quoting Brown, 232 F.3d at 594).

---

while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation.  This man then left the two others and walked west on Euclid Avenue.  Chilton and Terry resumed their measured pacing, peering, and conferring.  After this had gone on for 10 to 12 minutes, the two men walked off together, heading west on Euclid Avenue, following the path taken earlier by the third man.

Terry, 392 U.S. at 6.

Furthermore, reasonable suspicion is "based on an assessment of the totality of the circumstances." Beasley, 60 Va. App. at 395, 728 S.E.2d at 505 (quoting Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008)). In other words, law enforcement must look at the "whole picture." Navarette, 134 S. Ct. at 1687 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Whether the totality of the circumstances, viewed objectively, justified a brief investigatory stop "'is dependent upon both the content of information possessed by police and its degree of reliability.'" Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

Reasonable suspicion can be based on an officer's personal observations or information supplied by another. See id. at 1688. However, "to provide reasonable suspicion, either the informant or information given must exhibit 'sufficient indicia of reliability'" Giles v. Commonwealth, 32 Va. App. 519, 525, 529 S.E.2d 327, 330 (2000) (quoting White, 496 U.S. at 326-27). "'[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' . . . But under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" Navarette, 134 S. Ct. at 1688 (quoting White, 496 U.S. at 329, 327).

Here, the dispatch information was not a truly anonymous tip like those at issue in White and its progeny. The tipster in this case was the hotel's front desk clerk, whose name and contact information was on the dispatch sheet entered into evidence at the suppression hearing. The clerk saw and spoke to a male matching the description of the suspect when he came to get a room key from the front desk. The clerk told the dispatcher that the male was intoxicated and high. The clerk also relayed information given to her by the hotel guests who had seen the male suspect banging on the hotel room door. Because the motel clerk was identifiable, the

information she provided was not truly "anonymous" and thus exhibited more reliability than an anonymous tip.

Furthermore, to the extent that some of the information came from an unnamed motel guest and could therefore be considered an "anonymous" tip, "'anonymous [information that has] been sufficiently corroborated [may] furnish reasonable suspicion . . . [justifying an] investigative stop.'" Gregory v. Commonwealth, 22 Va. App. 100, 106, 468 S.E.2d 117, 120 (1996) (quoting White, 496 U.S. at 331). In Florida v. J.L., 529 U.S. 266, 268 (2000), the United States Supreme Court held that an anonymous call, reporting that a young black male wearing a plaid shirt and standing at a bus stop was carrying a gun, did not justify an investigatory stop. The caller could not be traced and identified, the call was not recorded, the caller did not state how he knew about the gun, and there were no other facts giving rise to reasonable suspicion. Id. The Court held that, without more, a tip cannot give rise to reasonable suspicion of criminal activity simply because the description of the suspect is accurate. Id. at 271-72 ("[R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.").

By contrast, a tip that bears adequate indicia of reliability in addition to an accurate description of the suspect may serve as a basis for reasonable suspicion. In Navarette, the tip at issue bore several other indicia of reliability, including: the specificity of the tip, the eyewitness knowledge of the tipster, the fact that the tip was made contemporaneously with the observation of suspicious events, the tipster's use of the 911 system, and that the tip turned out to be accurate. 134 S. Ct. at 1688-90. Because of these additional factors indicating reliability, the Navarette Court held that the 911 call from an eyewitness reporting a specific act of reckless driving provided reasonable suspicion to justify a traffic stop. Id. at 1692.

Like the tip in Navarette, and in contrast to the tip in Florida v. J.L., the information provided to the officer here bore numerous additional indicia of reliability. Here, the information very specifically and accurately described the suspects, their actions, and their location. The desk clerk and the hotel guests who made reports could be identified, the call was recorded via the 911 system, and the call was made contemporaneously with the alleged break-in. The hotel guests observed the suspects banging on the door of the room, and the desk clerk who made the call observed that Spence was high and intoxicated. Thus, the officer in this case had much more than just an accurate description of the suspect as a basis for reasonable suspicion.

Furthermore, the officer's observations of the unusual scene at the hotel room corroborated the dispatch information and served as an additional basis for the officer's reasonable suspicion. Spence and the trial court contend that the officer could not have had a reasonable suspicion that criminal activity was afoot because there were no signs of burglary at the scene. However, as the Commonwealth argues, an officer need not observe explicitly criminal behavior or suspect a particular crime to justify a stop. See Navarette, 134 S. Ct. at 1691; Hatcher v. Commonwealth, 14 Va. App. 487, 490, 419 S.E.2d 256, 258 (1992).

It is well settled that reasonable suspicion "need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002). "While the officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch,'' Sokolow and Terry do not require that the articulable facts show that criminal activity actually is afoot, only that it *may* be afoot." Richards v. Commonwealth, 8 Va. App. 612, 617, 383 S.E.2d 268, 271 (1989). And, "[t]here may be circumstances where wholly lawful conduct might justify the suspicion that criminal activity 'may be' afoot." Id. (citing Terry, 392 U.S. at 30; United States v. Sokolow, 490 U.S. 1, 9 (1989)). In other words, "the possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct.

- 8 -

Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal." Raab, 50 Va. App. at 581-82, 652 S.E.2d at 147 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.5(b), at 482 (4th ed. 2004)). Thus, the possibility that Spence and his companions were lawfully in the hotel room did not preclude the officer from making further investigations.

Furthermore,

> an officer need not suspect an individual of a *particular* crime in order to justify a Terry stop. A general suspicion of some criminal activity is enough, as long as the officer can, based on the circumstances before him at the time, articulate a reasonable basis for his suspicion.

Hatcher, 14 Va. App. at 490, 419 S.E.2d at 258 (1992) (emphasis added); see also Raab, 50 Va. App. at 583 n.2, 652 S.E.2d at 148 n.2 (finding that an officer need not explicitly testify that a suspect was stopped to investigate a specific crime).

Because a general suspicion of criminal activity is enough, it is inapposite that the officer here did not see specific signs of forced entry and did not testify that she suspected Spence of committing a particular crime. Here, the officer had information that Spence appeared to be intoxicated and high when he went to the front desk. The front desk clerk told the dispatcher that Spence and another male were seen banging on the door to room 175 and the clerk did not think that anyone was in that room. Through the open door to the motel room, the officer made specific and articulable observations of the strange scene before her, including the sick and unresponsive woman on the floor, Spence's elusive and incoherent mannerisms, and the white powdery substance on Spence's mouth. Viewed objectively, these observations served as the basis for a reasonable suspicion that a burglary, drug-related crime, or other criminal activity may have been afoot. In other words, under the totality of the circumstances, an objectively reasonable officer would most certainly not have walked away from the scene without

maintaining the status quo and conducting further investigation. Simply put, just as Officer McFadden was justified in seizing John Terry for purposes of a pat down, so to was Officer Schwegler justified in seizing and detaining Spence in order to confirm or dispel her suspicions of criminal activity.

Because the seizure was proper under the Fourth Amendment, the trial court erred in granting Spence's motion to suppress the evidence.[2]

## III. CONCLUSION

For the foregoing reasons, we reverse the ruling of the trial court and remand the case for further proceedings.

<u>Reversed and remanded.</u>

---

[2] This Court need not reach the issue of whether the exclusionary rule would apply had the seizure been unlawful because we decide that the seizure was lawful under the Fourth Amendment and the motion to suppress should have been denied.